# Exhibit F

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBENSON JEAN-PIERRE and JEAN METELUS, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>J&L CABLE TV SERVICES, INC.;<br><br>    Defendant. | Case No.: 1:18-cv-11499-MLW<br><br>**DECLARATION OF JEAN FREDERIQUE** |

## DECLARATION OF JEAN FREDERIQUE

I, Jean Frederique declare:

1. I have personal knowledge of the facts stated in this declaration and would testify to those facts if called upon to do so.

2. I am an adult resident of Lauderdale Lakes, Florida.

3. I worked as a Field Technician for J&L Cable TV Services, Inc. (J&L) in Florida, Massachusetts, Connecticut, New Hampshire and Maine between approximately January 2017 through January 2018.

4. I worked in Florida from January 2017 through June 2017. I continued to work for J&L in Massachusetts, Connecticut, New Hampshire and Maine from June 2017 through August 2017. In late August 2017, I returned to Florida and worked for J&L until January 2018.

5. I worked in the Boca Raton, Florida branch, the Boston, Massachusetts branch and for branches in Connecticut, New Hampshire and Maine.

6. During this entire time, J&L classified me as a non-exempt employee.

7. J&L installs and maintains communications products throughout Florida and Massachusetts as well as the United States.

8. During my time working for J&L, I performed various services related to the installation and repair of wireless services for J&L's clients; specifically, Comcast and Spectrum. The services included, but were not limited to: installing cable, internet and phone; troubleshooting, running new telephone lines; running coax cables for new outlets; installing ground cable; educating customers on equipment; providing customer service; and replacing and installing drops.

## EXPERIENCE WORKING AT J&L AS A FIELD TECHNICIAN

## TYPICAL WORK DAY

9. Throughout my tenure as a Technician for J&L, I often arrived to work between 6:30 a.m. and 7:00 a.m. each day. My day typically began at the warehouse, where I would spend between thirty (30) minutes and one (1) hour a day to wait in lines with other Technicians to pick up equipment and load up my truck with equipment.

10. I was also required to report to the warehouse one day per week, roughly one hour before I started the day's jobs, so that J&L could perform an inventory of the equipment in my vehicle and so I could obtain additional equipment, e.g., modems, cable boxes, including DTA (type of cable box), remotes, cable cords, coax cables, telephone line cubes, electrical tap, stickers, signs, nails, silicone, Ethernet cable, amplifiers, tie wrap, ground wire, DVR boxes, grounders (for aerial drops), splitters, fittings, plastic moldings and wood putty from J&L. My supervisors, Mike and Volendy, instructed me not to write down the time spent during these inventory check-ins on my time sheets. It is my understanding that I was not paid for these additional hours of work.

11. J&L required me to attend mandatory weekly meetings to discuss installations and ways to increase productivity. These meetings were typically between thirty (30) minutes to fourty (45) minutes each week. Like other Technicians, I was required to attend these meetings. It is my understanding that I was not paid for attending these meetings.

12. J&L notified me of my jobs for the day around 6:00 a.m. through "Tech Net," which is the application J&L used to assign jobs for the day and to monitor my activities. In addition to being to notified by Tech Net, my supervisors, Jean, Mike, and Carmen, would call me on my work phone and also on my personal cellphone if I had not logged in to Tech Net by 7:00 a.m.

13. Typically, J&L assigned me between six (6) and seven (7) jobs per day. J&L assigned me as many as fifteen (15) jobs in a single day. J&L limited the allotment of time for each job to a two (2) hour time frame. Individual jobs typically took between one (1) hour and four (4) hours to complete, however, one job could take an entire day to complete. Some days, even though J&L assigned me a full work load, J&L would force me to help out other Technicians. J&L did not count this toward my jobs assigned per day. Therefore, in addition to the total jobs assigned per day by J&L, my total jobs for the day would increase by as much as two (2) extra jobs per day.

14. Jobs were added and taken away from me on Tech Net during the course of the day. Throughout my employment, I would click on a job J&L assigned to me on Tech Net, accept the job, enter the job location in the GPS and drive to the customer's home. Once I accepted a job, an automatic text message is generated to the customer that a Technician is on the way. When I arrived at the job and parked the truck outside the customer home, I entered Tech Net again to update my status as "signed in." After signing into a job, an additional text message

is sent to the customer that the Technician has arrived. However, between two (2) and three (3) times a week, J&L would erase the job from the system, taking away the job from me even though I already arrived at the customer's home. On many occasions, I called my supervisor, Mike to complain that the job was taken away and Mike said, "I sent an email to dispatch to get the job back, and dispatch did not respond." I typically waited an extra thirty (30) minutes for the job to come back, but it rarely did. It was my understanding that I was not paid for the time spent on Tech Net, the time spent driving to and from the customer location, and the time spent on the phone with my supervisor.

15. After I completed a job, I would drive to the next job. The drive time between jobs often took between twenty (20) and thirty (30) minutes, and sometimes as long as one (1) hour. J&L, however, made me underreport my drive time.

16. Throughout the day, I was also required to assist other Technicians with their jobs. Only the Technician that was originally assigned the job was paid for the job completed. It was my understanding I was not paid for this time.

17. My day usually ended around 7:30 p.m. There were many days I finished at 8:30 p.m. After I finished my last job, I drove directly home. After I finished my last job, I drove directly home. I did not return to the warehouse until the next morning of work.

18. In total, I would work six (6) days per week, between twelve (12) hours and fourteen (14) hours per day, and between seventy-two (72) and eighty-four (84) hours per week.

## MEAL AND REST BREAKS

19. The number of jobs assigned in a given day, the amount of time jobs typically took to complete, and the pressure placed upon me by supervisors to complete all daily assignments made it nearly impossible to take meal and rest breaks. J&L did not make rest breaks available to me, and generally, my work schedule was too busy to take a rest break.

4

20.     I was typically not provided with a meal period, during which I was relieved of all duties. I was directed by my supervisor to work through my meal periods. Any time I took to eat would typically take place while I was driving from one job to another, and even then, I was required to have my cellular telephone on me at all times and be available to respond to any work calls. J&L required me to enter I took a meal break, when in fact I typically ate in my truck while driving to the next job. If I did not enter that I took a meal break, J&L's billing department would enter that I took a meal break.

## COMPENSATION

21.     Based on my wage statements alone, it was not clear to me how J&L computed my wages. My wage statements said I was paid on an hourly basis and did not reflect any piece rates, but I was told I was compensated on a piece rate basis. While working for J&L, I entered codes for the various job tasks I performed, and each of those codes corresponded to a specific dollar amount. I was also required to keep track of my hours, and submitted my hours to J&L. Though my wage statements made it impossible to know exactly how J&L determined my wages, I believe my compensation was based on a piece rate and hourly basis.

22.     While J&L made it impossible for me to know how they computed my wages, I know J&L did not pay all the wages I earned in a variety of ways. For example, J&L would regularly delete piece-rate codes for tasks I had completed, or change the codes to a lower paying code. J&L would also instruct me not to enter a code at all, even though I completed the corresponding task. I was also told not to enter any piece rate codes when assisting other Technicians with jobs.

23.     J&L would also instruct me to underreport my time. J&L typically required me to write that my start time began an hour after I actually started working. J&L also typically

required me to write that I stopped working several hours before I actually stopped working. If I did not underreport my time as instructed, J&L regularly would manipulate my time cards to reduce my total work time. Technician supervisors and managers alike, instructed me to reduce my true hours worked in order to show higher production and increase my hourly rate. Both of my supervisors and my manager instructed me to reduce my hours by clocking out before I finished my job. My superivsor Jean told me, "Clock out for lunch, no matter if you take a lunch." My supervisor Mike told me, "Clock out early because you don't want to make too much hours."

24. Based on my interactions and conversations with other Technicians, J&L regularly deleted or changed piece rate codes for tasks I completed and regularly manipulated my time entries. I was instructed to underreport my time, and based on my conversations with my co-workers, it is my understanding that other field technicians were also not paid the accurate overtime wages.

25. In order to do my job, I had to purchase various tools and equipment, such as a wireless drill, drill bits, pliers, screwdriver, staple gun, nails, splitters, strippers, safety vest, wrench, crimper, safety glasses, many types of cable, gasoline for trucks, cable caddy, ladder belt, boots and pants. Because J&L did not provide proper tools and equipment, I was forced to sign the "J&L Loan Agreement." This agreement stated that J&L was to loan me the funds in order to finance the purchase of tools I needed to complete jobs assigned to me by J&L. My paystubs reflected deductions for the tools and equipment necessary to purchase in order to complete the jobs.

26. Further deductions were also made from my pay. If a customer called back with the same service issue, or something was not working properly, replacement parts were deducted from my pay. I understand that lost equipment was also deducted from my pay.

27. J&L also failed to provide accurate wage statements. My pay stubs showed several regular and overtime rates, without ever explaining which rates applied to a given job, day's or even week's work. My pay stubs did not reflect my piece-rate activity. I believe the wage statements were inaccurate as they did not include the all the hours I worked, did not include compensation for missed meal and rest periods, and did not include all of my piece rates.

I declare under penalty of perjury under the laws of the State of Florida that the foregoing is true and correct and based upon my own personal knowledge.

Executed on this ___4___ day of December, 2018.

DocuSigned by:<br>
*Jean Frederique*<br>
—56D61D625A77437...<br>
Jean Frederique