# EXHIBIT A

DocuSign Envelope ID: FC4C4A08-66F3-4684-A1A1-7D5A4AF11DEC

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ROBENSON JEAN-PIERRE and JEAN METELUS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>J&L CABLE TV SERVICES, INC.;<br><br>Defendant. | Case No.: 1:18-cv-11499-MLW<br><br>**DECLARATION OF JEAN FREDERIQUE** |

**DECLARATION OF JEAN FREDERIQUE**

I, Jean Frederique declare:

1. I have personal knowledge of the facts stated in this declaration and would testify to those facts if called upon to do so.

2. I am an adult resident of Palm Beach, Florida.

3. I previously submitted an affidavit in this case.

4. I worked as a Field Technician for J&L Cable TV Services, Inc. (J&L) in Florida, Massachusetts, Maine and Connecticut, between approximately January 2017 through January 2018.

5. I worked in Florida from January 2017 through June 2017. I continued to work for J&L in Massachusetts, Maine and Connecticut, from June 2017 through August 2017. In late August 2017, I returned to Florida and worked for J&L until January 2018.

6. J&L's employment policies, procedures, and practices, including regarding compensation, hours worked, and breaks were similar in Massachusetts, Maine, Connecticut and Florida.

DocuSign Envelope ID: FC4C4A08-66F3-4684-A1A1-7D5A4AF11DEC

7. During my time working for J&L in Florida, Massachusetts, Maine, and Connecticut, J&L classified me as a non-exempt employee. I performed similar installation and repair of wireless services for J&L's clients in each location I worked. The services for all of the clients included, but were not limited to: installing cable, internet and phone; troubleshooting, running new telephone lines; running coax cables for new outlets; installing ground cable; educating customers on equipment; providing customer service; and replacing and installing drops.

**EXPERIENCE WORKING AT J&L AS A FIELD TECHNICIAN**

**TYPICAL WORK DAY OUTSIDE OF FLORIDA**

8. In Massachusetts, Maine, and Connecticut, my day typically began at the warehouse. In each of these states, like in Florida, I spent between thirty (30) minutes and one (1) hour waiting in lines with other Technicians to pick up equipment and load up my truck with equipment.

9. As in Florida, my manager, Brian Smith, the operations manager for Massachusetts, Maine, and Connecticut, instructed me not to include the time spent at the warehouse during inventory check-ins. Additionally, my supervisor, Brendon, who was the field supervisor in Massachusetts, Maine, and Connecticut, instructed me not to include the time spent at the warehouse during inventory check-ins. These inventory check-ins occurred when I reported to the warehouse before I started the day's jobs. It is my understanding that I was not paid for these additional hours of work in Florida, Massachusetts, Maine, or Connecticut.

10. Whether I worked in Florida, Massachusetts, Maine, or Connecticut, J&L required me, and other Technicians to attend mandatory weekly meetings to discuss installations and ways to increase productivity. It is my understanding that I was not paid for attending these

DocuSign Envelope ID: FC4C4A08-66F3-4684-A1A1-7D5A4AF11DEC

meetings in any of the states.

11. In each state that I worked, J&L typically assigned me a number of jobs per day. J&L limited the allotment of time for each job even though some jobs took longer than the allotted time, and one job could take an entire day to complete. Some days, even though J&L assigned me a full workload, J&L would force me to help other Technicians. J&L did not count my time helping other Technicians toward my jobs assigned per day, nor was I paid for this work.

12. As in Florida, in Massachusetts, Maine, and Connecticut jobs were added and taken away from me during the course of the day. On many occasions I would accept a job and travel to the customer's home only to find that the job had been deleted. As in Florida, my supervisor, Brendon, the supervisor for Massachusetts, Maine and Connecticut, would say to me to hold on and he will send an e-mail to Comcast. I would say to Brendon that I was on the job and what happened to the job. After twenty-five (25) minutes Brandon would call me back and say we are going to send you a new job. This was very frustrating, and it wasted a lot of time. This happened many times each week. It was my understanding that I was not paid for the time spent on these deleted jobs regardless of whether I was working in Florida, Massachusetts, Maine, or Connecticut.

13. After I completed a job, I would drive to the next job. The drive time between jobs often took between twenty-five (25) minutes and one and a half hours (1.5), depending on the state. The distances between jobs were often over an hour for the jobs in both Massachusetts and Maine. J&L, however, made me underreport my drive time when I worked in Florida, Massachusetts, Maine, and Connecticut.

DocuSign Envelope ID: FC4C4A08-66F3-4684-A1A1-7D5A4AF11DEC

14. As in Florida, in Massachusetts, Maine, and Connecticut, I was also required to assist other Technicians with their jobs throughout the day. Only the Technician that was originally assigned the job was paid for the job completed. It was my understanding I was not paid for my time spent assisting other Technicians in any of these states.

15. My day usually ended around 7:30 p.m. There were many days I finished at 8:30 p.m., or even later. In each state, after I finished my last job, I drove directly home.

16. In total, I worked six (6) days per week, between twelve (12) hours and fourteen (14) hours per day, and between seventy-two (72) and eighty-four (84) hours per week when working in Florida, Massachusetts, Maine, and Connecticut.

**MEAL AND REST BREAKS IN MASSACHUSETTS, MAINE, AND CONNECTICUT**

17. The number of jobs assigned in a given day, the amount of time jobs typically took to complete, and the pressure placed upon me by supervisors to complete all daily assignments made it nearly impossible to take meal and rest breaks when I worked in Massachusetts, Maine, and Connecticut. J&L did not make rest breaks available to me, and generally, my work schedule was too busy to take a rest break in any of these states.

18. I was typically not provided with a meal period, during which I was relieved of all duties while working in Florida, Massachusetts, Maine, or Connecticut. I was directed by my supervisors in each of these states to work through my meal periods. Any time I took to eat would typically take place while I was driving from one job to another, and even then, I was required to have my cellular telephone on me at all times and be available to respond to any work calls. I felt constant pressure to get to the next job and stay on schedule. My supervisor Brendon said to me, "If you are busy, you can just grab something and eat while you are driving. You do not need to stop for lunch." I was forced to clock out for lunch, even when I did not take lunch.

DocuSign Envelope ID: FC4C4A08-66F3-4684-A1A1-7D5A4AF11DEC

J&L required me to enter that I took a meal break, no matter which state I worked in, when in fact I typically ate in my truck while driving to the next job. If I did not enter that I took a meal break, J&L's billing department would enter the meal break for me.

**COMPENSATION IN MASSACHUSETTS, MAINE AND CONNECTICUT**

19. The wage statements I received from J&L regardless of which state I worked in were similar. Based on these wage statements, it was not clear to me how J&L computed my wages earned from work in Florida, Massachusetts, Maine, or Connecticut. Despite being told that I was compensated on a piece rate basis for work done in each of these states, my wage statements reflected that I was instead paid on an hourly basis for work performed in each state, and did not indicate any piece rates.

20. J&L's billing procedures were similar in Florida, Massachusetts, Maine, and Connecticut. While working for J&L in each of these states, I entered the various job I performed. I was also required to keep track of my hours, and submitted my hours to J&L in each of these states. Though my wage statements made it impossible to know exactly how J&L determined my wages, I believe my compensation was based on a piece rate and hourly basis in each of these states.

21. While J&L made it impossible for me to know exactly how they computed my wages, I know that J&L did not pay all the wages I earned in a variety of ways in Florida, Massachusetts, Maine, and Connecticut. For example, J&L would regularly delete jobs I had completed, or change the jobs to a lower paying job in each state. During my time in each state J&L would also instruct me not to enter any job at all, even though I completed the corresponding task. I was also told not to enter any thing when assisting other Technicians with jobs.

DocuSign Envelope ID: FC4C4A08-66F3-4684-A1A1-7D5A4AF11DEC

22. J&L would also instruct me to underreport my time worked in Florida, Massachusetts, Maine, and Connecticut. For each state, J&L typically required me to write that my start time began after I actually started working. J&L also typically required me to enter that I stopped working several hours before I actually stopped working. If I did not underreport my time as instructed, J&L regularly would manipulate my time cards to reduce my total work time in each state. In each state, technician supervisors and managers alike, instructed me to reduce my true hours worked in order to show higher production and increase my hourly rate. My supervisors and my managers in Massachusetts, Maine, and Connecticut, like my supervisors and managers in Florida, instructed me to reduce my hours by clocking out before I finished my job. My supervisor Brendon said to me, "You are making too many hours. It doesn't matter how many hours you work, you are paid for the jobs."

23. Based on my interactions and conversations with other Technicians, J&L regularly deleted or changed piece rates for tasks I completed and regularly manipulated my time entries for work performed in Florida, Massachusetts, Maine, and Connecticut. J&L regularly scratched my jobs and took away my hours. Many weeks I worked between eighty (80) and ninety (90) hours, but J&L always cut short the hours. I was instructed to underreport my time in each of these states, and based on my conversations with my co-workers, it is my understanding that other field technicians were also not paid the accurate overtime wages.

24. In order to do my job, I had to purchase various tools and equipment, such as a wireless drill, drill bits, pliers, screwdriver, staple gun, nails, splitters, strippers, safety vest, wrench, crimper, safety glasses, many types of cables, gasoline for trucks, cable caddy, ladder belt, boots, and pants. These tools were similar in each state that I worked in. Because J&L did not provide proper tools and equipment, I was forced to sign the "J&L Loan Agreement." This

DocuSign Envelope ID: FC4C4A08-66F3-4684-A1A1-7D5A4AF11DEC

agreement stated that J&L was to loan me the funds in order to finance the purchase of tools I needed to complete jobs assigned to me by J&L. My paystubs reflected deductions for the tools and equipment necessary to purchase in order to complete the jobs.

25. J&L made further deductions from my pay. If a customer called back with the same service issue, or something was not working properly, replacement parts were deducted from my pay. I understand that lost equipment was also deducted from my pay.

26. J&L also failed to provide accurate wage statements in each state that I worked. My pay stubs showed several regular and overtime rates, without ever explaining which rates applied to a given job, day's or even week's work. My pay stubs did not reflect my piece-rate activity. I believe the wage statements were inaccurate as they did not include all the hours I worked, did not include compensation for missed meal and rest periods, and did not include all of my piece rates in each state.

I declare under the laws of the State of Florida that the foregoing is true and correct and based upon my own personal knowledge.

Executed on this 23rd day of September, 2019.

DocuSigned by:
Jean Frederique

Jean Frederique