# EXHIBIT C

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBENSON JEAN-PIERRE and JEAN METELUS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>J&L CABLE TV SERVICES, INC.;<br><br>Defendant. | Case No.: 1:18-cv-11499-MLW<br><br>**SUPPLEMENTAL DECLARATION OF ESTY CAJUSTE** |

## DECLARATION OF ETSY CAJUSTE

I, Etsy Cajuste declare:

1. I have personal knowledge of the facts stated in this declaration and would testify to those facts if called upon to do so.

2. I am an adult resident of Fort Lauderdale, Florida.

3. I previously submitted an affidavit in this case.

4. I worked as a Field Technician for J&L Cable TV Services, Inc. (J&L) in Florida and Massachusetts between approximately June 2017 through November 2017.

5. I worked for J&L in Florida from approximately June 2017 through July 2017. I continued to work for J&L in Massachusetts from July 2017 through August 2017. In late August 2017, I returned to Florida and worked for J&L until November 2017.

6. J&L's employment policies, procedures, and practices, including regarding compensation, hours worked, and breaks were similar in Massachusetts and Florida.

7. During my time working for J&L in Florida and Massachusetts, J&L classified me as a non-exempt employee. I performed similar installation and repair of wireless services

for J&L's clients in each location I worked. The services for all of the clients included, but were not limited to: installing cable, internet and phone; troubleshooting, running new telephone lines; running coax cables for new outlets; installing ground cable; educating customers on equipment; providing customer service; and replacing and installing drops.

## EXPERIENCE WORKING AT J&L AS A FIELD TECHNICIAN

## TYPICAL WORK DAY OUTSIDE OF FLORIDA

8. In Massachusetts, my day typically began at the warehouse. In Massachusetts, like in Florida, I spent between thirty (30) minutes and one (1) hour waiting in lines with other Technicians to pick up equipment and load up my truck with equipment.

9. As in Florida, my manager, Brian Smith, who was the operations manager for Massachusetts, instructed me not to include the time spent at the warehouse during inventory check-ins. Additionally, my supervisor, Brendon, the field supervisor in Massachusetts, instructed me not to include the time spent at the warehouse during inventory check-ins. These inventory check-ins occurred when I reported to the warehouse before I started the day's jobs. It is my understanding that I was not paid for these additional hours of work in Florida or Massachusetts.

10. Whether I worked in Florida or Massachusetts, J&L required me, and other Technicians to attend mandatory weekly meetings to discuss installations and ways to increase productivity. These meetings were typically between one (1) hour and one and a half hours (1.5 hours) each week. It is my understanding that I was not paid for attending these meetings in any of the states.

11. In each state that I worked, J&L typically assigned me a number of jobs per day. J&L limited the allotment of time for each job even though some jobs took longer than the

allotted time, and one job could take an entire day to complete. Some days, even though J&L assigned me a full workload, J&L would force me to help other Technicians. J&L did not count my time helping other Technicians toward my jobs assigned per day, nor was I paid for this work.

12. As in Florida, in Massachusetts, jobs were added and taken away from me during the course of the day. On many occasions I would accept a job and travel to the customer's home only to find that the job had been deleted. As in Florida, my supervisor, Brendon, the supervisor for Massachusetts, would say to me that he needed to find out if the job was moved to another technician or if it was cancelled by the customer. After fifteen (15) or twenty (20) minutes, Brendon would call me back to inform me of the status. Most of the time, the job never came back. I would drive to the customer's home for no reason. Between driving to the customer's home and waiting to hear back from my supervisor, this wasted at least an hour. This would happen at least two (2) times a week. Similarly, J&L would regularly take jobs away from me when I was in the middle of a job or had not yet closed out my job. It was my understanding that I was not paid for these deleted jobs regardless of whether I was working in Florida or Massachusetts.

13. After I completed a job, I would drive to the next job. The drive time between jobs often took between twenty (20) minutes and two (2) hours, depending on the state. The drive time between jobs in Florida often took between thirty (30) and forty-five (45) minutes, while the drive time in Massachusetts often took between one (1) and one and a half (1.5) hours. In Massachusetts the hotel was located very far from the warehouse. When I would drive from the hotel to the warehouse it took from approximately one hour and fifteen minutes (1 hour, 15

3

minutes) and two (2) hours. J&L, however, made me underreport my drive time when I worked in Florida and Massachusetts.

14. As in Florida, in Massachusetts, I was also required to assist other Technicians with their jobs throughout the day. Only the Technician that was originally assigned the job was paid for the job completed. It was my understanding I was not paid for my time spent assisting other Technicians in any of these states.

15. My day usually ended between 7:00 p.m. and 9:00 p.m. There were many days I finished at 10:00 p.m. In each state, after I finished my last job, I drove directly home or to the hotel.

16. In total, I worked six (6) days per week, between twelve (12) hours and fifteen (15) hours per day, and between seventy-two (72) and ninety (90) hours per week when working in Florida and Massachusetts.

## MEAL AND REST BREAKS IN MASSACHUSETTS

17. The number of jobs assigned in a given day, the amount of time jobs typically took to complete, and the pressure placed upon me by supervisors to complete all daily assignments made it nearly impossible to take meal and rest breaks when I worked in Massachusetts. J&L did not make rest breaks available to me, and generally, my work schedule was too busy to take a rest break in any of these states.

18. I was typically not provided with a meal period, during which I was relieved of all duties while working in Massachusetts. I was directed by my supervisor Brendon to work through my meal periods. Any time I took to eat would typically take place while I was driving from one job to another, and even then, I was required to have my cellular telephone on me at all times and be available to respond to any work calls. J&L required me to enter that I took a meal break, no matter which state I worked in, when in fact I typically ate in my truck while driving to

4

Case 1:18-cv-11499-MLW   Document 58-4   Filed 09/24/19   Page 6 of 8

the next job. If I did not enter that I took a meal break, J&L's billing department would enter the meal break for me.

## COMPENSATION IN MASSACHUSETTS

19. The wage statements I received from J&L regardless of which state I worked in were substantially similar. Based on these wage statements, it was not clear to me how J&L computed my wages earned from work in Massachusetts. Despite being told that I was compensated on a piece rate basis for work done in each of these states, my wage statements reflected that I was instead paid on an hourly basis for work performed in each state, and did not indicate any piece rates.

20. J&L's billing procedures were similar in Florida and Massachusetts. While working for J&L in each of these states, I entered the various jobs I performed. I was also required to keep track of my hours, and submitted my hours to J&L in each of these states. Though my wage statements made it impossible to know exactly how J&L determined my wages, I believe my compensation was based on a piece rate and hourly basis in each of these states.

21. While J&L made it impossible for me to know exactly how they computed my wages, I know that J&L did not pay all the wages I earned in a variety of ways in Florida and Massachusetts. For example, J&L would regularly delete jobs I had completed, or change the jobs to a lower paying job in each state. J&L had many excuses for deleting my jobs. For example, J&L would tell me the job I entered did not match the description. Also, I often went to a customer's home to run a new line, especially when I worked on an aerial drop. J&L would say that the customer already had service, and even though I spent time running a new line, J&L would not pay me for the job I completed. During my time in each state J&L would also instruct me not to enter any job at all, even though I completed the corresponding task. I was also told not to enter anything when assisting other Technicians with jobs.

22. J&L would also instruct me to underreport my time worked in Massachusetts. For each state, Florida and Massachusetts, J&L typically required me to enter that my start time began after I actually started working. J&L also typically required me to enter for each state that I stopped working several hours before I actually stopped working. If I did not underreport my time as instructed, J&L regularly would manipulate my time cards to reduce my total work time in each state. In each state, technician supervisors and managers alike, instructed me to reduce my true hours worked in order to show higher production and increase my hourly rate. My supervisor in Massachusetts, Brendon, and my operational manager in Massachusetts, Brian Smith, like my supervisors and managers in Florida, instructed me to reduce my hours by clocking out before I finished my job. I complained to my supervisor Brendon about my low pay checks. Brendon would say to focus on the codes, don't worry about the hours.

23. Based on my interactions and conversations with other Technicians, J&L regularly deleted or changed jobs I completed and regularly manipulated my time entries for work performed in Florida and Massachusetts. I was instructed to underreport my time in each of these states, and based on my conversations with my co-workers, it is my understanding that other field technicians were also not paid the accurate overtime wages.

24. In order to do my job, I had to purchase various tools and equipment, such as a wireless drill, drill bits, pliers, screwdriver, staple gun, nails, splitters, strippers, safety vest, wrench, crimper, safety glasses, many types of cables, gasoline for trucks, cable caddy, ladder belt, boots, and pants. These tools were similar in each state that I worked in. Because J&L did not provide proper tools and equipment, I was forced to sign the "J&L Loan Agreement." This agreement stated that J&L was to loan me the funds in order to finance the purchase of tools I

needed to complete jobs assigned to me by J&L. My paystubs reflected deductions for the tools and equipment necessary to purchase in order to complete the jobs.

25. J&L made further deductions from my pay. If a customer called back with the similar service issue, or something was not working properly, replacement parts were deducted from my pay. I understand that lost equipment was also deducted from my pay.

26. J&L also failed to provide accurate wage statements in each state that I worked. My pay stubs showed several regular and overtime rates, without ever explaining which rates applied to a given job, day's or even week's work. My pay stubs did not reflect my piece-rate activity. I believe the wage statements were inaccurate as they did not include all the hours I worked, did not include compensation for missed meal and rest periods, and did not include all of my piece rates in each state.

I declare under the laws of the State of Florida that the foregoing is true and correct and based upon my own personal knowledge.

Executed on this 24th day of September, 2019.

DocuSigned by:

Esty Cajuste