# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBENSON JEAN-PIERRE and JEAN METELUS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>J&L CABLE TV SERVICES, INC.;<br><br>Defendant. | Case No.: 1:18-cv-11499-MLW<br><br>**DECLARATION OF CHARLES POMPILUS** |

## DECLARATION OF CHARLES POMPILUS

I, Charles Pompilus declare:

1. I have personal knowledge of the facts stated in this declaration and would testify to those facts if called upon to do so.

2. I am an adult resident of Boynton Beach, Florida.

3. I worked as a Field Technician for J&L Cable TV Services, Inc. (J&L) in Florida and Pennsylvania between approximately June 2018 through September 2018.

4. I worked in Florida for one day in June 2018. I continued to work for J&L in Pennsylvania from June 2018 through September 2018.

5. During my entire time working for J&L, J&L classified me as a non-exempt employee. I performed installation and repair of wireless services for J&L's clients. The services for all of the clients included, but were not limited to: installing cable, internet and phone; troubleshooting, running new telephone lines; running coax cables for new outlets; installing

ground cable; educating customers on equipment; providing customer service; and replacing and installing drops.

## EXPERIENCE WORKING AT J&L AS A FIELD TECHNICIAN

## TYPICAL WORK DAY IN PENNSYLVANIA

6. In Pennsylvania, my day typically began at the warehouse. I spent between twenty (20) minutes and forty-five (45) minutes waiting in lines with other Technicians to pick up equipment and load up my truck with equipment.

7. Inventory check-ins occurred when I reported to the warehouse before I started the day's jobs. It is my understanding that I was not paid for these additional hours of work in Pennsylvania.

8. J&L required me, and other Technicians to attend mandatory weekly meetings to discuss installations and ways to increase productivity. These meeting usually lasted around one (1) hour. It is my understanding that I was not paid for attending these meetings in Pennsylvania.

9. J&L typically assigned me a number of jobs per day. J&L limited the allotment of time for each job even though some jobs took longer than the allotted time, and one job could take an entire day to complete. Some days, even though J&L assigned me a full workload, J&L would force me to help other Technicians. I helped out other Technicians two (2) times a week. J&L did not count my time helping other Technicians toward my jobs assigned per day.

10. Jobs were added and taken away from me during the course of the day. On many occasions I would accept a job and travel to the customer's home only to find that the job had been deleted. I would call my supervisors in Pennsylvania to complain, both Matt and Julius. I typically called my supervisor Julius first to let him know that I was at the job assigned to me and now the job is not on my board. Julius would say, "hold on, let me see if I can get the job back for you."

Julius would also tell me to call dispatch. I would call dispatch, give my badge number and for the majority of the time, dispatch would usually say that the job was given to another technician. It was a lot of wasted time. Jobs were taken away from me, after I entered the job in the GPS and drove to the customer's home on average three (3) times a week. It was my understanding that I was not paid.

11. After I completed a job, I would drive to the next job. The drive time between jobs often took between thirty (30) minutes and two (2) hours. It is my understanding I was not always paid for this drive time.

12. I was required to assist other Technicians with their jobs throughout the day. Only the Technician that was originally assigned the job was paid for the job completed. I was asked to help out Technicians multiple times a week. It was my understanding I was not paid for assisting other Technicians.

13. My day usually ended between 7:00 p.m. or 8:00 p.m.; however, there were days when I finished at 10:00 p.m. After I finished my last job, I drove directly to the hotel. I did not return to the warehouse until the next morning of work.

14. In total, I worked between six (6) and seven (7) days per week, between twelve (12) hours and fifteen (15) hours per day, and between seventy-two (72) and one hundred and five (105) hours per week when working in Pennsylvania.

## MEAL AND REST BREAKS IN PENNSYLVANIA

15. The number of jobs assigned in a given day, the amount of time jobs typically took to complete, and the pressure placed upon me by supervisors to complete all daily assignments made it nearly impossible to take meal and rest breaks when I worked in Pennsylvania. J&L did

not make rest breaks available to me, and generally, my work schedule was too busy to take a rest break.

16. I was typically not provided with a meal period, during which I was relieved of all duties. I was directed by both of my supervisors in Pennsylvania, Matt and Julius, to work through my meal periods. My supervisor Julius would say, "We have a lot of jobs today. You don't have to take your lunch break, just do a lot of jobs." Any time I took to eat would typically take place while I was driving from one job to another, and even then, I was required to have my cellular telephone on me at all times and be available to respond to any work calls. J&L required me to enter that I took a meal break, when in fact I typically ate in my truck while driving to the next job.

## COMPENSATION IN PENNSYLVANIA

17. Based on my wage statement alone, it was not clear to me how J&L computed my wages. Despite being told that I was compensated on a piece rate basis for work performed, my wage statements reflected that I was instead paid on an hourly basis for work performed and did not indicate any piece rates.

18. As for J&L's billing procedures, I entered the various jobs I performed. I was also required to keep track of my hours, and submitted my hours to J&L. Though my wage statements made it impossible to know exactly how J&L determined my wages, I believe my compensation was based on a piece rate and hourly basis in each of these states.

19. While J&L made it impossible for me to know exactly how they computed my wages, I know that J&L did not pay all the wages I earned in a variety of ways. For example, J&L would delete jobs I had completed, or change the jobs to a lower paying job in Pennsylvania. J&L would also instruct me not to enter a job at all, even though I completed the corresponding task.

J&L would eliminate my jobs and I brought this to the attention of my supervisor Matt. Matt said to me, "You have too much codes for this job." I would tell him that I performed all the codes I entered, but J&L still eliminated the codes I completed. I also complained to my supervisor Julius about my missing codes. Additionally, I was told not to enter anything when assisting other Technicians with jobs.

20. J&L would also instruct me to underreport my time. J&L typically required me to enter on my device that my start time began after I actually started working. Technician supervisors and managers alike, instructed me to reduce my true hours worked in order to show higher production and increase my hourly rate. My supervisors, both Matt and Julius, instructed me to reduce my hours by clocking out before I finished my job. Both Matt and Julius did not stress the amount of hours I worked, they stressed completing as many jobs as possible.

21. Based on my interactions and conversations with other Technicians, J&L regularly deleted or changed jobs for tasks I completed. I was instructed to underreport my time, and based on my conversations with my co-workers, it is my understanding that other field technicians were also not paid the accurate overtime wages.

22. In order to do my job, I had to purchase various tools and equipment, such as a wireless drill, drill bits, pliers, screwdriver, staple gun, nails, splitters, strippers, safety vest, wrench, crimper, safety glasses, many types of cables, gasoline for trucks, cable caddy, ladder belt, boots, and pants. Because J&L did not provide proper tools and equipment, I was forced to sign the "J&L Loan Agreement." This agreement stated that J&L was to loan me the funds in order to finance the purchase of tools I needed to complete jobs assigned to me by J&L. Deductions were made from my pay check for flat head screw drivers, strippers, cutters, clamps, shirts and a safety

harness. I could never do my job properly without those supplies and tools. My paystubs reflected deductions for the tools and equipment necessary to purchase in order to complete the jobs.

23. J&L made further deductions from my pay. If a customer called back with the same service issue, or something was not working properly, replacement parts were deducted from my pay. I understand that lost equipment was also deducted from my pay.

24. J&L also failed to provide accurate wage statements. My pay stubs showed several regular and overtime rates, without ever explaining which rates applied to a given job, day's or even week's work. My pay stubs did not reflect my piece-rate activity. I believe the wage statements were inaccurate as they did not include all the hours I worked, did not include compensation for missed meal and rest periods, and did not include all of my piece rates in Pennsylvania.

I declare under the laws of the State of Florida that the foregoing is true and correct and based upon my own personal knowledge.

Executed on this 24th day of September, 2019.

DocuSigned by:

Charles Pompilus