<pre>
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS
 2

 3

     ROBENSON JEAN-PIERRE AND JEAN METELUS,   )
 4   ON BEHALF OF THEMSELVES AND ALL OTHERS    )   Civil Action
     SIMILARLY SITUATED,                       )   No. 18-11499-MLW
 5                                             )
                     Plaintiffs,               )
 6                                             )
     vs.                                       )
 7                                             )
     J&L CABLE TV SERVICES, INC.,              )
 8                                             )
                     Defendant.                )
 9


10
                      BEFORE THE HONORABLE MARK L. WOLF
11                       UNITED STATES DISTRICT JUDGE

12
                            VIDEOCONFERENCE
13


14
                           August 31, 2021
15


16
                   John J. Moakley United States Courthouse
17                            One Courthouse Way
                        Boston, Massachusetts  02210
18

19

20

21
                                   Kelly Mortellite, RMR, CRR
22                                 Official Court Reporter
                                   One Courthouse Way, Room 3200
23                                 Boston, Massachusetts  02210
                                   mortellite@gmail.com
24

25
</pre>

1   APPEARANCES:

2   Counsel on behalf of Plaintiff:
    Ori Edelstein
3   Michelle S. Lim
    Schneider Wallace Cottrell Konecky Wotkyns LLP
4   2000 Powell Street
    Suite 1400
5   Emeryville, CA 94608
    415-421-7100

6
    Sarah R. Schalman-Bergen
7   Lichten & Liss-Riordan, P.C.
    Suite 2000
8   729 Boylston St.
    Boston, MA 02116
9   617-994-5800

10  Stacy Savett
    Shoshana Savett
11  Alexandra Piazza
    Berger Montague PC
12  1818 Market Street
    Suite 3600
13  Philadelphia, PA 19103
    215-875-3014

14
    Counsel on behalf of Defendant:
15  Frederick B. Finberg
    Peter Bennett
16  The Bennett Law Firm, P.A.
    75 Market Street
17  Suite 201
    Portland, ME 04101
18  207-773-4775

19

20

21

22

23

24

25

<pre>
 1                      P R O C E E D I N G S
 2          THE COURT:  Good afternoon.  Would the clerk please
 3   call the case.
 4          COURTROOM CLERK:  This is Civil Action Number
 5   18-11499, *Robenson Jean-Pierre, et al. v. J&L Cable TX*
 6   *Services*.
 7          THE COURT:  Good afternoon.  Would counsel please
 8   identify themselves for the Court and for the court reporter.
 9          MR. EDELSTEIN:  Good afternoon, Your Honor.  Ori
10   Edelstein from Schneider Wallace for the plaintiffs.
11          MS. SAVETT:  Good afternoon, Your Honor.  Stacy Savett
12   from Berger Montague for the plaintiffs.
13          THE COURT:  Stop, stop, stop.  Excuse me.  Stop.
14   Ms. Savett, I couldn't hear you clearly, and the stenographer
15   may not have heard you either.  Would you say your name again,
16   and we'll check your connection.
17          MS. SAVETT:  Yes, Your Honor.  Stacy Savett from
18   Berger Montague for plaintiffs' counsel.
19          THE COURT:  Okay.  Now, Ms. Schalman.
20          MS. PIAZZA:  Good afternoon.  This is Alexandra Piazza
21   from Berger Montague.
22          MS. SCHALMAN-BERGEN:  Good afternoon, Your Honor.
23   Sarah Schalman-Bergen from Lichten and Liss-Riordan.
24          MS. LIM:  Good afternoon, Your Honor.  Michelle Lim
25   from Schneider Wallace.
</pre>

1          THE COURT:  And for the defendant?

2          MR. FINBERG:  Good afternoon, Your Honor.  This is

3     Rick Finberg for defendant.

4          THE COURT:  All right.

5          MR. BENNETT:  Your Honor, Peter Bennett for the

6     defendant.  Good afternoon.

7          THE COURT:  All right.  I'm sorry, who was that?

8     Mr. Bennett, okay.  Thank you.

9          As you know, but I will say for the record, this is a

10    class action alleging violations of the Fair Labor Standards

11    Act or FLSA and related Massachusetts, Maine and New Hampshire

12    as well as Pennsylvania wage and hour laws brought by several

13    subclasses in an FLSA collective of field technicians against

14    their employer, former employer, defendant J&L Cable TV

15    Services.  Robenson Jean-Pierre, John Metelus, Bill McKee and

16    Michael Gary Fauntleroy are the named plaintiffs.

17         The class, as we've just heard, is represented by

18    Schneider, Wallace, Cottrell, Konecky, LLP, or SWCK, Berger

19    Montague, sometimes referred to as BM, and Lichten &

20    Liss-Riordan PC.

21         The parties reached a proposed settlement agreement

22    under which J&L would pay a gross settlement amount of

23    $1,850,000 to the class to resolve their wage and hour claims.

24    Following a February 3, 2021 preliminary approval hearing and

25    after considering supplemental briefing by class counsel, the

 1    Court preliminarily approved the settlement on May 10, 2021.  I

 2    also approved a form of notice to the class, which I understand

 3    is implemented.

 4          So today's hearing is to address whether the

 5    settlement should be finally approved, the class counsel's

 6    motions for attorneys' fees and expenses and the request for

 7    service awards to each of the four named plaintiffs.

 8          To my knowledge, no objections or requests for

 9    exclusions from the settlement have been received.  Is that

10    correct, to counsel's understanding as well?

11          MR. EDELSTEIN:  Yes, Your Honor, that's correct.

12    There have been no requests for exclusions and no objections.

13          THE COURT:  You'll have to identify yourself for the

14    record when you're speaking, Mr. Edelstein.

15          MR. EDELSTEIN:  My apologies.  Ori Edelstein for the

16    plaintiffs.

17          THE COURT:  This is a hearing being conducted by

18    videoconference, but it's open to the public.  Is there anybody

19    on the videoconference who wishes to object to the settlement?

20    No.

21          So in my May 10, 2021 memorandum and order, docket 77,

22    for reasons described at pages 3 to 5, I've found that this

23    Court has jurisdiction over the state law claims.  I did that

24    analysis on the assumption there would be 475 state law class

25    members and 218 FLSA collective opt-in members.  How many state

1  class members are there now?

2          MR. EDELSTEIN:  Your Honor, I think it's 545 state

3  class members and 75 opt-ins.  Sorry, sorry.  Ori Edelstein for

4  the plaintiffs, so you have it for the record.  It is 545 state

5  class members with 75 opt-ins who are not participants in one

6  of the state classes.  It is 218 total opt-ins, but most of

7  those are also participants in one of the classes.

8          THE COURT:  Okay.  I thought it was 632.  But it's

9  618?

10          MR. EDELSTEIN:  632 is the correct number.  If my math

11  didn't add up, then I apologize.

12          THE COURT:  I don't think it did.  545 and 75, I think

13  that's going to be 610.  Anyway.  Well, go ahead.

14          MR. EDELSTEIN:  It is 75 opt-ins were not class

15  members, and it's 632 total collective and class members, so

16  whatever the math is, that gets us 557 class members, Your

17  Honor.

18          THE COURT:  Okay.  There are a total of 632.

19          MR. EDELSTEIN:  Correct.

20          THE COURT:  All right.  Well, I've considered numbers

21  of approximately that dimension.  And unless somebody wants to

22  add something, I find that those numbers don't alter the

23  analysis that I did on May 10 or in the May 10, 2021 memorandum

24  and order, so I continue to find that there's jurisdiction.

25          Does anybody want to be heard on that?

1          MR. EDELSTEIN:  Ori Edelstein for the plaintiffs, Your

2    Honor.  No objection to that.

3          THE COURT:  All right.  And am I correct that the

4    notice required by the Class Action Fairness Act, 28 United

5    States Code, Section 1715(d) was given to the relevant State

6    Attorneys General and U.S. Attorneys in October 2020 and no

7    objections from them have been received?

8          MR. EDELSTEIN:  Correct, Your Honor.

9          THE COURT:  And was the notice distributed to the

10   class in the manner that I ordered previously?

11         MR. EDELSTEIN:  It was, Your Honor.

12         THE COURT:  All right.  So I believe the matters on

13   the agenda are the following.  First I have to decide whether

14   to finally certify the state law classes that I preliminarily

15   approved.  As I understand it, I finally approved the FLSA

16   collective.  I finally certified the FLSA collective on May 10.

17   Is that right?

18         MR. EDELSTEIN:  Correct, Your Honor.

19         THE COURT:  Then we'll move from class certification

20   to argument concerning whether the proposed settlement should

21   be finally approved.  I have a couple of questions about the

22   allocation plan.  Then we'll move to the motion for attorneys'

23   fees and then to the motion for service awards and I think to

24   approve Greater Boston Legal Services as the cy pres recipient.

25         Are there other matters that should be on the agenda?

1          MR. EDELSTEIN:  Not for plaintiffs, Your Honor.

2          MR. FINBERG:  Nor for defendants, Your Honor.

3          THE COURT:  In the May 10, 2010 order with regard to

4    preliminary approval, I wrote that for the purposes of

5    preliminary approval, the plaintiffs have satisfied the

6    requirements of numerosity, commonality and typicality, and

7    that the action may properly be maintained under Rule 23(b)(3)

8    of the Federal Rules of Civil Procedure.

9          After considering plaintiffs' supplemental memorandum

10   and supporting documents, the Court also concludes that the

11   named plaintiffs are adequate class representatives for the

12   purpose of preliminary approval of the settlement.

13         I'm not aware of any developments that call into

14   question whether those should be my final conclusions with

15   regard to Rule 23(b)(3), but would counsel like to address

16   that, class certification?

17         MR. EDELSTEIN:  Thank you, Your Honor.  Ori Edelstein

18   for the plaintiffs.  We would agree with Your Honor's

19   assessment.  There have been no changes in that analysis that

20   would cause the Court to alter its preliminary approval, and we

21   would ask the Court to finally approve the class.  We're happy

22   to address any of the issues individually, but I don't believe

23   that's necessary.

24         THE COURT:  This will come up in connection with the

25   service awards.  The adequacy of the class representatives, the

1    class action paradigm, although this isn't a public PLSRA case,

2    it's not a securities case, but I think the paradigm generally,

3    as I wrote in *Arkansas Teacher*, is that the clients pick the

4    lawyers.  The clients supervise the lawyers, including with

5    regard to settlement, and scrutinize any requests for

6    attorneys' fees.

7              I questioned the named representatives thoroughly last

8    February, and I made the preliminary findings that I made.  But

9    in this case, and perhaps if not probably in most cases like

10   this, it looks like the lawyers found the class

11   representatives.  I think all of them -- I re-read this

12   yesterday.  I think all of them testified that they didn't know

13   about the terms of the settlement until they had been agreed to

14   by the lawyers.

15             So why should I find the class representatives

16   adequate?  And if any of the principles that I stated you think

17   are not applicable here, don't be timid about telling me.

18             MR. EDELSTEIN:  Thank you, Your Honor.  Ori Edelstein

19   for the plaintiffs.  Adequacy looks at the claims of the

20   representatives and whether or not they are going to represent

21   the interests of the class, and they've done that here.  And

22   they spent considerable time actively involved in litigation

23   from the get-go, as Your Honor heard from them directly and in

24   the supplemental briefing and declarations that you received

25   from the named plaintiffs.  Each of them was involved and

1    actively involved from the get-go, assisted in the drafting of

2    the complaint --

3           THE COURT:  They assisted -- hold on just a second.

4    Just one second.  All right.  Why don't you go ahead and try to

5    be specific because I don't think they all did the same thing.

6           MR. EDELSTEIN:  True, Your Honor, but they were all

7    actively involved from the get-go.  You know, our first two

8    named plaintiffs were involved in drafting the initial

9    complaint.  They scrutinized those documents to ensure that the

10   allegations in those were accurate.  There were multiple calls

11   and interviews with each of them to ensure that what was being

12   alleged was accurate, the claims captured all the violations

13   that were potentially at issue, and that was all in the

14   interest of the class.

15          After filing the complaint, they were involved in

16   drafting their declarations in support of conditional

17   certification.  They were discussing and consulted in

18   discussions on settlement ADR.

19          THE COURT:  I don't think so.  I think the testimony I

20   heard in February told me that only Mr. McKee and

21   Mr. Fauntleroy spoke to you about mediation and settlement

22   before the mediation.

23          MR. EDELSTEIN:  That was the testimony, Your Honor.  I

24   think in the supplemental declarations you can see that we did

25   have calls, counsel did have calls with each of the named

1    plaintiffs before the mediation to discuss potential early

2    resolution.  I think that maybe at the time of the testimony

3    that wasn't -- they didn't recall that, but they did supplement

4    that in their declarations.

5            THE COURT:  Are those calls reflected in the law

6    firm's records?

7            MR. EDELSTEIN:  Yes, Your Honor.

8            THE COURT:  Okay.

9            MR. EDELSTEIN:  They all -- I believe they all may

10   have only been the first two named plaintiffs that were

11   involved in discovery as well, though I believe the other two

12   were involved -- let me correct that.  Sorry.

13           All four of the named plaintiffs were involved in

14   discovery as well.  Two of them did serve responses, and the

15   other two were part of the opt-ins who were subject to

16   discovery just prior to reaching a resolution of the case.  And

17   throughout that time while they were doing that, they had the

18   class interests at heart, and that's reflected I think, as Your

19   Honor noted, there have been no objections and no requests for

20   exclusions.

21           What they have done here is they have obtained a

22   really excellent result for the class and collective, and they

23   did that by keeping the class and collective interests at heart

24   the entire time.  They weren't in this for their own personal

25   benefit.  They weren't seeking only to recover the money for

1    themselves.  They at all times were doing this for the class's

2    benefit.  And because of their efforts, they obtained the

3    result that is going to benefit many people, 632 of them.

4         And I would note, Your Honor, they are attending the

5    hearing.  They didn't make an appearance officially, but they

6    are all here attending the hearing to make sure this gets

7    completed and approved.

8         THE COURT:  I see Mr. Fauntleroy.  I see Mr. McKee.  I

9    see Mr. Metelus, and I see Mr. Jean-Pierre.

10        Okay.  Well, I'm satisfied that the requirements of

11   Rule 23(a) and (b)(3) are met, so I'm certifying, I'm now

12   certifying for settlement purposes the state law settlement

13   class as described on page 3 of the proposed order the

14   plaintiffs gave me, docket number 143-4, more specifically a

15   Massachusetts state law class comprised of all individuals who

16   worked for J&L Cable TV Services as a technician in

17   Massachusetts between July 18, 2015 and August 28, 2020, a New

18   Hampshire state law class comprised of all individuals who

19   worked for J&L Cable TV Services, Inc. as a technician in New

20   Hampshire between July 18, 2015 and August 28, 2015.  I'm

21   certifying a Maine state law class comprised of all individuals

22   who worked for J&L Cable TV Services as a technician in Maine

23   between July 18, 2012 and August 28, 2020.  I'm certifying a

24   Pennsylvania state law class comprised of all individuals who

25   worked for J&L Cable TV Services, Inc. as a technician in

1    Pennsylvania between July 18, 2015 and August 28, 2020.

2         I note that I previously finally certified the federal

3    FLSA settlement collective as being comprised of all current

4    and former technicians who were employed by J&L Cable TV

5    Services between July 18, 2015 and August 28, 2020 who have

6    opted in to this case.

7         Is there anything further with regard to class

8    certification?

9         MR. EDELSTEIN:  Not from plaintiffs, Your Honor.

10        THE COURT:  All right.  Let's move to the motion to

11   approve the settlement pursuant to Rule 23(e).  To approve the

12   settlement I have to make the finding -- well, I have to find

13   after hearing that it is fair, reasonable and adequate, and I

14   must consider whether the class representatives and the class

15   counsel have adequately represented the class, whether the

16   proposal was negotiated at arm's length, whether the relief

17   provided for the class is adequate, taking into account certain

18   specified factors, and whether the proposal treats class

19   members equitably relative to each other.

20        The plaintiffs have addressed this in their

21   memorandum, but would you like to speak to it, Mr. Edelstein?

22        MR. EDELSTEIN:  Sure, yes, Your Honor.  Was that just

23   generally or was there something in particular you wanted --

24        THE COURT:  Why should the settlement be approved?

25        MR. EDELSTEIN:  Thank you, Your Honor.  As Your Honor

1    noted, the question is whether it's a fair, reasonable and

2    adequate settlement.  I think the class and collective members

3    have all spoken by their decision not to opt -- to exclude

4    themselves or to object to the settlement.  632 people received

5    the notice approved by the Court, and none of them had any

6    issues with the settlement.

7         I would note that the notice provided to them

8    indicated exactly -- well, not exactly -- gave them an

9    approximate amount as to their recovery.  It outlined the fees,

10   the amounts that were to be paid to the attorneys, the service

11   awards, the administration costs and a summary of what they

12   would expect to receive.  And with all that information

13   provided, none of them felt the need to object or request

14   exclusion, and I think that's because this is an excellent

15   settlement for all of those 632 individuals.

16        The average recovery is almost $1800 per person.  The

17   max recovery is over $12,000 with 318 individuals receiving

18   more than a thousand dollars and 185 receiving more than

19   $200,000.  These amounts are significant for these employees.

20   It reflects the time and effort that they should have been

21   paid, and they saw that information and determined on their own

22   that this was a fair, reasonable and adequate settlement,

23   including the fee request, the service awards and the admission

24   costs.

25             THE COURT:  Well, I do find class counsel are

1  experienced and vigorous and adequate, to use a term of art.

2  As I said before, I think the class representatives didn't

3  direct the attorneys or advise as much as would be ideal, but I

4  think that reflects somewhat the nature of the class, that

5  people are technicians, two of them not born in the United

6  States as I recall.

7       Am I right that the settlement was negotiated at arm's

8  length after mediation and not immediately after mediation?

9       MR. EDELSTEIN:  Correct, Your Honor.  The settlement

10  was negotiated through the mediator, Mark Irvings.  We had a

11  session I believe in May, beginning of May, and the settlement

12  wasn't reached until three and a half months later in late

13  August.  And in that time we continued to negotiate the terms

14  but we also re-initiated litigation.

15       At that point was when the opt-ins were subject to

16  discovery.  We were working on preparing responses for 52

17  opt-ins.  We were working on scheduling a significant number of

18  depositions.  So the case did not sit still at that point.  All

19  parties believed that a settlement was not at that time in the

20  works, even though we continued to negotiate, and that was

21  reached only through arm's length negotiations.

22       THE COURT:  And what formal and informal discovery did

23  you have from the defendants before agreeing to settlement?

24       MR. EDELSTEIN:  Before we had formal discovery

25  responses, I think they produced, prior to mediation,

1    approximately 12,000 pages of documents.  We had pay and time

2    records for portions of the class and collective.  We had

3    personnel files for our clients with policies and handbooks

4    that were applicable.  I believe we had some GPS records

5    showing the time and locations of the trucks that the

6    technicians were driving.  I believe following the first day of

7    the mediation additional documents were produced, a total of I

8    believe over 21,000 documents were received and reviewed prior

9    to the settlement being agreed to.

10            THE COURT:  Okay.  And what were the costs and risk of

11    litigation, a trial and appeal?

12            MR. EDELSTEIN:  Thank you, Your Honor.  As with any

13    wage and hour class action, there's always risks for the

14    collective that it would be de-certified for the classes, that

15    they would not be certified, and that's something that

16    plaintiffs' counsel deal with on all these wage and hour claims

17    at the outset.

18            I would note as well that following mediation there

19    was a motion to amend defendants' answer to assert an

20    affirmative defense that would have barred all the overtime

21    claims altogether.  The magistrate judge rejected --

22            THE COURT:  What affirmative defense was that?

23            MR. EDELSTEIN:  I think it was for sales associate, I

24    believe.  I can't recall off the top of my head.  The

25    magistrate judge denied that motion, but it was on a request

1   for reconsideration and would have potentially undermined all

2   of the claims or all the overtime claims altogether if the

3   defendants could prove that affirmative defense.

4        And then beyond just certification issues, there's

5   always liability issues, whether or not we can -- there was

6   obviously a dispute.  Defendants denied that the technicians

7   were working off the clock.  Whether or not we could prove that

8   at trial, and of course, even if we could, as Your Honor noted,

9   there would be appeals most likely as a result if we were to

10  continue to litigate.

11       THE COURT:  And we, I believe, discussed this before,

12  but the actual settlement by your calculation provides what

13  percentage of potential damages if you were to prevail?

14       MR. EDELSTEIN:  Yes, Your Honor.  And we updated those

15  numbers for you in our final approval papers accounting for the

16  additional class members.  The total, including liquidated

17  damages, the total exposure was 5.33 million that we

18  calculated.  So our settlement is 35 percent of that, which is

19  a robust portion of the actual total exposure.

20       When you look just at the substantive damages,

21  excluding the liquidated damages, the settlement is 85 percent

22  of the exposure, which is an even more obviously robust and an

23  excellent outcome in this situation.

24       THE COURT:  If you calculated the damages correctly,

25  which you may have, are multiple damages available under all of

```
 1    the laws or just some of the state laws?
 2              MR. EDELSTEIN:  Multiple.  I'm not sure I --
 3              THE COURT:  The liquidated damages, treble damages.
 4              MR. EDELSTEIN:  Well, liquidated damages, yes, it's
 5    available under the FLSA, and then it is available, I believe
 6    single, double liquidated damages is available under -- I'm
 7    going to mix these up, Pennsylvania and -- no -- Massachusetts
 8    and Maine I believe have treble damages, and Maine and New
 9    Hampshire have double damages.
10              THE COURT:  All right.  Thank you.  Are the class
11    members treated equitably compared to each other?
12              MR. EDELSTEIN:  Yes.  So to account for that, we used
13    work weeks, and we allocated two work weeks for the
14    Pennsylvania and New Hampshire classes and three -- sorry --
15    two shares per work week for Pennsylvania and New Hampshire and
16    three shares for Massachusetts and Maine.
17              THE COURT:  And was there some concern that if this
18    litigation went on and the plaintiff prevailed, the defendant
19    would not have a financial means to pay a judgment?
20              MR. EDELSTEIN:  That is always a risk, Your Honor, and
21    it's highlighted by the quarantine and the COVID-19, I think
22    that was a very legitimate concern and risk that was involved
23    here.  We had many cases where that has become an issue.  That
24    was raised as a part of the settlement.  It's one of the
25    reasons why we had a payment plan where defendants are paying
```

1   into the QSF over time.  They've already paid a significant

2   amount of that, and I don't see -- we haven't heard any

3   concerns that they wouldn't be able to, but there's always --

4        THE COURT:  Here.  Let me try to unpack this a little

5   bit.  So was it your concern that during the COVID-19 pandemic,

6   which hasn't disappeared by any means, people would have fewer

7   service technicians in their homes, that J&L's business might

8   fail, or their ability -- they could become bankrupt or their

9   ability to pay a substantial judgment in the future would be

10  injured.  Is that part of your concern?

11       MR. EDELSTEIN:  I mean, that's a concern, yes, for all

12  of our pieces.  It wasn't particular to this case.  Our more

13  immediate concern was trying to get money for our clients and

14  for the class and collective, recognizing, you know, that this

15  quarantine and COVID-19 is impacting everybody significantly,

16  and we wanted to try to get them the money that was owed to

17  them or as much of it as we could soon as possible.

18       THE COURT:  When you said "as soon as possible," the

19  settlement agreement provides for 11 payments, the first one I

20  think at the preliminary approval in May and ten other equal

21  monthly installments.  Why is that?  And why was it reasonable?

22       MR. EDELSTEIN:  Correct, Your Honor.  What I was just

23  indicating was that was part of the issue I think surrounding

24  the quarantine and COVID-19 and defendant's financial health.

25  That was part of our discussions with them.  And one of the

1    reasons we did that was their inability to pay all the money up
2    front or the risk of doing so, and we tried to accommodate that
3    by having it paid over time.
4         THE COURT:  And have the payments, monthly payments
5    been made?
6         MR. EDELSTEIN:  They have, Your Honor, yes.  And
7    defendants do have the option of paying all of the money at any
8    point.  So if they are on more secure financial footing, they
9    hopefully will do that so we can get the money out to the class
10   as soon as possible.
11        THE COURT:  All right.  You say "as soon as possible."
12   It has to be essentially 11 months after May of 2021, right?
13        MR. EDELSTEIN:  I believe the last payment is in March
14   of 2022 following that schedule.  However, what I was noting
15   was that they have the option of paying more if they are able
16   to.  So my hope was that if they were able to that they would
17   do that and therefore would be able to get the money --
18        THE COURT:  This will come up later.  When do the
19   attorneys get any award of attorneys' fees I may make, at the
20   same time as the distribution to the class?
21        MR. EDELSTEIN:  Correct, Your Honor.
22        THE COURT:  All right.  Mr. Finberg, do you want to be
23   heard on the reasonableness of the settlement?
24        MR. FINBERG:  Briefly, Your Honor.  We can certainly
25   confirm that the negotiations were at arm's length and extended

1   over a number of months and likely only succeeded due to the

2   continuing involvement of the mediator, Mr. Irvings.  Certainly

3   this matter is hotly contested in terms of liability as well as

4   whether a collective action and Rule 23 certification would

5   have been appropriate absent the resolution.

6        So we fully expected, had this not settled, that we

7   would have had months, if not years, of additional litigation,

8   including motion work, motion for de-certification, opposition

9   to motion for certification.  And I would suspect with this

10  type of case that one or both parties may have ended up on

11  appeal for some issue or other, Your Honor.

12       So in terms of the liability, we certainly continue to

13  reject the claim that there's any liability, and so we actually

14  think this is quite fair for the plaintiffs.  Both the named

15  plaintiffs and their attorneys from our perspective made

16  lemonade out of lemons.

17       THE COURT:  All right.  Well, having examined this and

18  considered the arguments at this hearing, I find that the

19  proposed settlement is fair and reasonable and adequate.  I

20  find that class counsel have energetically and effectively

21  brought their vast experience to representing the class, that

22  the class representatives have been adequate, the proposed

23  settlement was negotiated at arm's length.

24       Actually, there was a question I need to ask you that

25  I asked last time but I'd like to confirm.  Did the defendant

1    discuss the attorneys' fees that plaintiffs' counsel would seek
2    or receive before the total amount of the settlement was agreed
3    upon?
4        MR. FINBERG:  No.  My recollection is that the
5    settlement amount came first, and as part of that, certainly
6    the settlement agreement contains the proposed amount for the
7    attorneys' fees.
8        THE COURT:  Is that right, Mr. Orstein -- Mr.
9    Edelstein?
10       MR. EDELSTEIN:  That's okay.  That's correct.  The
11   settlement agreement does indicate that defendants won't object
12   to the amount up to a third, and it was not discussed
13   beforehand.
14       THE COURT:  Okay.  It was not discussed before the
15   1,800,000 was agreed to; is that right?
16       MR. EDELSTEIN:  Correct, Your Honor.
17       THE COURT:  So I'm satisfied that this was negotiated
18   at arm's length after mediation and after continued efforts by
19   the mediator.  The settlement was reached after significant
20   informal discovery from the defendant.  In those circumstances
21   the settlement is presumptively reasonable, and the other
22   relevant factors confirm the reasonableness of the settlement.
23       The litigation, had it continued, would have been
24   risky from the plaintiffs' perspective and, in any event, would
25   have been lengthy, and it's possible that the defendant might

1    not have been able to pay a claim years from now if there was a

2    substantial judgment.  The amount of the settlement, it's

3    represented to me, is about 35 percent of potential damages if

4    the plaintiffs prevailed and received double or treble damages.

5    When permitted, it's, I'm told, 85 percent of actual damages.

6    Even if the percentages are not quite that high, they are a

7    significant percentage of the potential recovery, which has to

8    be discounted by the risk of litigation and for the immediate

9    value of the class members getting money soon rather than

10   possibly in the far future.

11         The class members are treated equitably with regard

12   to, relative to each other.  Under the settlement agreement,

13   each will receive a pro rata share of the gross settlement fund

14   based on the number of work weeks that each class member worked

15   for J&L during the relevant time period, adjusting to account

16   for differences in the value of substantive law and penalty

17   claim of Massachusetts and Maine members by awarding those

18   classes additional settlement shares for each week worked.

19   This I find is an equitable allocation.

20         The attorneys' fees will be awarded within a

21   reasonable range.  There have been no objections or opt-outs,

22   and I find the method of distribution is reasonable, even

23   though the plaintiffs have to wait until 2022 to receive their

24   payments.  But I do find the settlement is reasonable.

25         So we'll move to the question of an award of

1  attorneys' fees.  As I understand it, the defendants are

2  requesting 33 percent of the common fund, $616,667 plus

3  expenses in the amount of $44,191.25; is that right?

4         MR. EDELSTEIN:  That's correct, Your Honor.

5         THE COURT:  All right.  As I pointed out to you, I

6  wrote about award of attorneys' fees extensively in *Arkansas*

7  *Teacher v. State Street*, 512 F. Supp. 3d 196, 220-21.  I do

8  intend to use the common fund basis for awarding fees.  As I

9  wrote in *Arkansas Teacher*, it's my understanding that it's most

10  appropriate to presume an award in the 20 to 30 percent range.

11  It's reasonable to start at 25 percent and to decide whether an

12  upward or downward adjustment is most appropriate.

13         At this time point the Court is a fiduciary for the

14  class.  This isn't an adversary process.  I'll note that I

15  didn't bring this to your attention earlier, but I'll mention

16  it because I've read it, the pertinent part of it.  The most

17  recent study of fees and class recoveries in Federal Court to

18  my knowledge is in Attorneys' Fees in Class Actions:  2009 -

19  2013, that's by Eisenberg, Miller and Germano, published at 92

20  NYU Law Review 937, 952 in 2017.  There the Court found that

21  the mean fee in FLSA cases from 2009 to 2013 was 30 percent and

22  the median award was 33 percent.

23         I've done some calculations.  If I were to award 25

24  percent, that would be $462,500.  If I were to award 28

25  percent, that would be $518,000.  If I awarded 30 percent, that

1    would be $555,000, and the 33.33 percent would be $616,667.  So

2    an award of 30 percent, for example, would be $61,667 less than

3    the requested 33 percent award.

4         And as I said at the preliminary approval hearing, I

5    have some concern that the way the requests are made, if I

6    award 33 percent of the fee, of the common fund as attorneys'

7    fees and make $40,000 of service awards and pay the, I think,

8    $30,000 for administration expenses, that's 40 percent of the

9    total fund, sort of off the top, it's not available.  If I

10   awarded 30 percent -- and I know not every class member would

11   get the same, but I think it would average another $100 for

12   each class member as compared to 33 percent.

13        Anyway, those are things I've been thinking about.  Do

14   you want to address the requests for attorneys' fees?

15        MR. EDELSTEIN:  Yes, Your Honor.  Thank you.  I think

16   as Your Honor noted, this case has been litigated energetically

17   by both sides but particularly by plaintiffs' counsel.  We have

18   spent thousands of hours prosecuting this case over the course

19   of three years, and we did that to the significant benefit of

20   hundreds of workers.

21        These workers, 632 workers who potentially wouldn't

22   have received any money are now receiving on average $1800 each

23   as a result of our work and the work of our named plaintiffs.

24   Notably, as I indicated earlier, the amount of the attorneys'

25   fees requested was in the notice that was distributed to the

1    class and collective members, and, again, nobody objected and

2    nobody requested an exclusion.

3            THE COURT:  How often do you get an objection in these

4    cases?  You do them all the time.

5            MR. EDELSTEIN:  We do.  We do get objections at times,

6    not that frequently, but they do exist, they do happen.  And

7    that is sometimes a grounds for objecting where the fee

8    requested is exorbitant, but here it's not.  The amount of time

9    and effort warrants -- and ultimately the result that was

10   obtained warrants an upward adjustment of the fee request that

11   there be 33 percent that we indicate here.  The case is

12   complex.  It was litigated heavily.  We spent a lot of time on

13   the case.

14           THE COURT:  I know you offered me the detailed

15   records, and I didn't take anybody up on that offer.  But when

16   we talk about the lodestar check, I'm going to tell you it's

17   useless in this case.  You didn't -- you did tell me, and of

18   course you would have been foolish not to tell me, that you

19   don't have clients who regularly pay the rates ascribed to

20   them.  But I still don't know where those rates came from or

21   why they're the customary rates in this community in Boston.

22   But we'll get to that in a minute.

23           But it's just hard for me to tell what all those hours

24   were spent on.  And I say that in part because whatever I

25   award, maybe I'll have the good fortune to see you all again,

1    and you'll know even better what I'm expecting.  But go ahead,

2    keep going.

3              MR. EDELSTEIN:  Thank you, Your Honor.  And I would

4    note, I think as Your Honor did earlier, that in wage and hour

5    cases and in particular FLSA cases, the 33 percent is the

6    customary amount.  And there is significant risk in these cases

7    that we could have recovered nothing, and that happens at

8    times, and it's one of the risks we face as class counsel on

9    the plaintiffs' side, that we may recover nothing, and in those

10   cases --

11             THE COURT:  Well, what I said was that one Eisenberg

12   study showed that the median was 33 percent.  If I understand

13   it correctly, it means that half the awards are higher and half

14   of them are lower and the mean --

15             MR. EDELSTEIN:  Correct.

16             THE COURT:  -- the average was 30 percent.

17             MR. EDELSTEIN:  According to that study, correct.  And

18   we did cite you several cases in our motion from the circuit

19   and from the district and from outside, both of those, that

20   show that the 33 percent is regularly awarded in wage and hour

21   class actions.

22             THE COURT:  As I said to you at the preliminary

23   hearing, and I know I'm supposed to consider the amounts

24   customarily given in other cases, but I know these things

25   usually go very fast.  Nobody objects.  You asked for a third.

1   The easiest thing for the judge to do is to sign off on it, and

2   then that becomes the customary rate.  But, you know, having

3   written in perhaps excruciating detail about how the

4   presumptive range is 20 to 30 percent, start at 25 percent and

5   decide whether to go up or down, I don't know why there would

6   be sort of a general exception for FLSA cases where the

7   customary rate is 33 percent.

8         MR. EDELSTEIN:  And that's understandable, Your Honor.

9   I think there's a couple of issues at play.  I think one, as I

10  was just discussing, there's significant risks in these wage

11  and hour class actions and FLSA actions that there will be no

12  recovery at all.  I think there's also a public policy question

13  as to encourage.  You know, the FLSA is designed to benefit

14  workers who aren't getting paid the amounts they should under

15  the law as well as the wage and hour state law claims.  And to

16  encourage these types of actions and make sure that they're

17  being brought and litigated thoroughly and that those workers

18  are getting amounts that are owed to them, you know, there's a

19  public policy argument to make sure that counsel who are

20  adequately able to bring those types of claims are doing so and

21  getting compensated accordingly.

22        THE COURT:  But your colleagues and you are in firms

23  that specialize in these cases, you tell me.  Should I be

24  worried that you're not going to take these cases anymore if

25  you start getting only 30 percent instead of 33 percent or 28

1    percent?

2         MR. EDELSTEIN:  I don't think -- I think the argument

3    spills the other way.  It's to encourage as opposed to

4    discourage.  I don't think -- no, we probably wouldn't change

5    our practice, but I think because we've taken on those risks of

6    receiving nothing and because we're pursuing very well

7    established public policy interest in pursuing these claims

8    that we should be awarded for that risk.

9         THE COURT:  And so how long have you been doing these

10   kinds of cases, this kind of case?

11        MR. EDELSTEIN:  These class actions in particular,

12   about five years.

13        THE COURT:  And some of your colleagues have had even

14   more experience.

15        MR. EDELSTEIN:  Correct.

16        THE COURT:  I'm trying to get educated.  In how many

17   of those cases do you recover nothing?

18        MR. EDELSTEIN:  That's a significant number,

19   significant number actually, Your Honor.  You know, we try to

20   minimize those.  We try to pick the right cases, but it does

21   happen.  Cases get to arbitration early on or they get

22   litigated and don't get certified.  We have a similar case that

23   was also cable technicians in California that these two firms

24   were handling where the class was not certified and so we had

25   to pursue claims individually.  And yeah, we were unable to

1   settle that case or reach resolution.

2           THE COURT:  And so did you try the case?

3           MR. EDELSTEIN:  No.  We settled it on an individual

4   basis.

5           THE COURT:  And you settled it for one person or small

6   number of people?

7           MR. EDELSTEIN:  Yes, a group of employees, correct.

8           THE COURT:  And about what percentage would you and

9   your colleagues -- they can speak up -- find that you brought

10   the case, you invested time and energy in it and the class and

11   the law firm recovered nothing?

12           MR. EDELSTEIN:  I haven't done a study of all the

13   cases we handled, but I would say probably 10 to 15 percent of

14   cases, and maybe my colleagues may have numbers they can speak

15   to.  But for us, it's an estimate for sure.  I haven't done

16   that analysis.  But there are a significant number of cases

17   where we don't recover anything.

18           THE COURT:  And how do your colleagues respond to that

19   question?  You've got two other law firms.

20           MS. PIAZZA:  I mean, I agree it's a small percentage

21   of cases before we recover nothing, but it's not a zero number.

22           THE COURT:  Okay.

23           MS. SCHALMAN-BERGEN:  Your Honor, I did litigate and

24   negotiate the settlement in this case.  I switched firms and

25   have a different firm, so I'm local counsel in this matter.

1    But what I'll say is that in these cases oftentimes we are

2    challenging large labor practices that the company feels very

3    confident in these classification cases.  And here in this case

4    the defendants felt very confident that their exemption defense

5    would apply.  And so we do -- I don't have a percentage for

6    you, but what I will say is that we lose cases, lose cases on

7    summary judgment, and part of the reason that the FLSA provides

8    for these things is because, as Mr. Edelstein rightly pointed

9    out -- remedial statute, and low-wage workers don't have the

10   resources to go up against these large companies.  So allowing

11   contingent fees in the amount of one-third, which, as Your

12   Honor correctly pointed out is the median, the common amount

13   awarded is consistent with the expectations of the client.  And

14   it also compensates us for the work that we do.

15        One of the other things that's I think important to

16   consider in a contingent practice is that we're advancing tens,

17   sometimes hundreds of thousands of dollars.  That comes out of

18   the law firm's pockets in a that way it doesn't on the defense

19   side, right.  The defendant pays for that.  And so the firm is

20   not bearing that cost.

21        But bearing that cost for a number of large cases is a

22   very risky proposition, and it requires a substantial outlet.

23   And we do it because we believe in the work.  We believe and

24   care about the work, and we want to represent the clients, but

25   it does not come without substantial risk.  This is a very

1    risky practice to be in.  And you're right that we're very

2    successful, so I don't want to undermine that point.

3            THE COURT:  I saw that Ms. Liss-Riordan gave a million

4    dollars or more than a million dollars to her aborted

5    senatorial campaigns.

6            MS. SCHALMAN-BERGEN:  Ms. Liss-Riordan challenged

7    substantial practices in the economy in which we lost.  We had

8    a case as Your Honor is aware --

9            THE COURT:  Don't assume I'm aware.

10           MS. SCHALMAN-BERGEN:  Okay.

11           THE COURT:  Keep going.

12           MS. SCHALMAN-BERGEN:  It's cutting edge litigation.

13           THE COURT:  Which case?

14           MS. SCHALMAN-BERGEN:  In the GrubHub case.  So the

15   GrubHub case went to trial, Your Honor.

16           THE COURT:  GrubHub?

17           MS. SCHALMAN-BERGEN:  Right.  And the plaintiff lost

18   in that case, and we believe we should have won.  We believe it

19   was a substantial injustice to workers, the classification, but

20   we lost.  We can't bring in those cases and stand up for the

21   rights of workers without the Court compensating us, and we

22   appreciate that, Your Honor.

23           THE COURT:  Well, the issue is not whether you're

24   going to get compensated.  In this case it's not whether or not

25   you're going to get compensated at or toward the upper end of

1    the presumptive reasonable range for other kinds of cases.

2            You know, if you get 30 percent, you'll get, the three

3    firms will get $61,000 less than they would get at 33 percent.

4    And you are representing low-paid people, although maybe not as

5    low paid in this case as in some other cases, but low-paid

6    people, and it does advance an important public policy.  But

7    the fact they're low-paid people, if there's an unusual

8    percentage going to the lawyers, you know, then those low-paid

9    people are getting less money than they otherwise would get.

10   And my role at this point is to be a fiduciary for the class

11   because nobody is going to come in on the other side and

12   argue --

13           MS. SCHALMAN-BERGEN:  Absolutely, Your Honor.  In this

14   case particularly, as I'm local counsel, this is more of an

15   academic discussion for me because my co-counsel will

16   substantially benefit from this case.  But just as a matter of

17   practice, I do think it's an important public policy here, and

18   we absolutely respect your role.  It's an incredibly critical

19   role, and we're mindful of that when we seek fees.

20           So I think here my co-counsel are seeking a third,

21   which I think you pointed out is a median amount.  Certainly

22   there are cases where counsel seeks 40 percent, but we're not

23   doing that here.  But I'll be quiet because this is more an

24   academic discussion for me than anything else.

25           THE COURT:  Well, it's not, because you have an

1   institutional interest in this.  Let me tell you, I have to do

2   a lodestar check on the reasonableness of the request.  And you

3   gave me a multiplier, you gave me a lodestar figure that was

4   about three times the amount requested.  And frequently there's

5   a multiplier, the amount requested is 1.8 above the correctly

6   calculated lodestar.  The lodestar, the Supreme Court tells us,

7   *Blum v. Stetson,* is to be calculated based on reasonable rates

8   times a reasonable number of hours.  And I wrote about this

9   extensively in *Arkansas Teacher*.  Reasonable rates are

10  reasonable rates in the community, so that would be here in

11  Massachusetts.  And evidence of what counsel charge is one

12  indicia -- paying clients, what they charge paying clients is

13  one indicia.

14          You made clear to me, as anybody should after *Arkansas*

15  *Teacher*, that you don't have paying clients, but you say these

16  are my firm's customary rates which have been accepted in other

17  cases, but I don't know where the customary rates came from.

18  Whether there's any effort to determine what lawyers, not in

19  your firms, charge for comparable work in this community.  Then

20  I'm looking at the fee affidavits, and I see that there are --

21  well, let me ask you this.  Were there any contract attorneys

22  used by any of the firms in this case?

23          MR. EDELSTEIN:  What do you mean by "contract firms"?

24          THE COURT:  Here.  Okay.  SWCK has three staff

25  attorneys listed.  What's a staff attorney?

1          MR. EDELSTEIN:  I believe the distinction is that they

2  are not full-time associates, so they're paid on a different

3  basis.

4          THE COURT:  Are they full-time employees of the firm,

5  or are they hired through agencies?

6          MR. EDELSTEIN:  No.  They are full-time employees of

7  the firm.

8          THE COURT:  Do they work full time for the firm?

9          MR. EDELSTEIN:  That I don't know, Your Honor.

10          THE COURT:  Well --

11          MR. EDELSTEIN:  I can find that out.  I'm not sure.

12          THE COURT:  So wait a minute.  Who is here from SWCK?

13  I want to --

14          MR. EDELSTEIN:  I am, Your Honor, Ori Edelstein.

15          THE COURT:  That's what I thought.  So these are three

16  people who worked on the case, I'm told.

17          MR. EDELSTEIN:  Correct, Your Honor.

18          THE COURT:  But you don't know if they work full time

19  for the firm?

20          MR. EDELSTEIN:  I don't know their employment

21  agreements with the firm itself, no, Your Honor.

22          THE COURT:  Have you met them?

23          MR. EDELSTEIN:  Not in person, Your Honor.  They are

24  in our Texas office.

25          THE COURT:  And each of them has ascribed to her an

1    hourly rate of $680, and you gave me their backgrounds.

2    They're relatively recent law school graduates from Texas.  The

3    highest Berger rate for a shareholder, which I assume means a

4    partner, is $670, and the highest Lichten Liss-Riordan rate is

5    $645.  So why are your staff attorneys, relatively new

6    attorneys who may not even work full time for your firm, worth

7    $680 an hour here in Massachusetts?

8            MR. EDELSTEIN:  Your Honor, their time is charged at

9    the same rate as our associates at their level.  I'm not sure

10   that there's a distinction in their experience that would

11   warrant charging less for their time.

12           THE COURT:  Are you sure there isn't?

13           MR. EDELSTEIN:  Am I sure there isn't?

14           THE COURT:  You told me this is their customary rate,

15   and it's not a rate that's charged to any client.

16           MR. EDELSTEIN:  That's correct, Your Honor.

17           THE COURT:  It's a rate that's used to give to judges

18   like me to do a lodestar check.  So what process is used to

19   develop the customary rates in your firm?

20           MR. EDELSTEIN:  Your Honor, we look at the rates in

21   our market, and we set our rates accordingly.  And then, as

22   Your Honor noted, the only way we can actually get these,

23   determine they're customary is then to have courts, at least

24   courts here and courts throughout the country approve those

25   rates.  And some courts do find that they're high.  But, you

```
 1   know, in California, I think the courts that we're in, most of
 2   the time those courts, as we've indicated, have approved these
 3   rates.
 4              THE COURT:  You're in California?  Are you in
 5   California?
 6              MR. EDELSTEIN:  Correct, Your Honor.
 7              THE COURT:  I'm in Massachusetts.  Your case is in
 8   Massachusetts.  And as I understand it, the rate is to be the
 9   Boston rate.  It may be higher than California; it may not.
10   But the lodestar check in this case, and I'm coming to think in
11   every case, is meaningless.  The Supreme Court thinks it's
12   meaningful, and I used to think it's meaningful, and my
13   colleagues have thought it's meaningful.
14              But I mean, there's only one case that was cited to me
15   where a Massachusetts court accepted anybody's rates.  I think
16   it's the Smith case that the Lichten firm or somebody cited,
17   you cited.  It's not supposed to be -- and the idea that judges
18   do this, I mean, how long does the usual hearing to approve a
19   settlement, certify a class, approve a settlement and award
20   attorneys' fees take?
21              MR. EDELSTEIN:  It depends on the judge, Your Honor.
22              THE COURT:  Well, yeah, from what to what?
23              MR. EDELSTEIN:  Sometimes they can be very short when
24   there's no objections and no requests for exclusions.  Half an
25   hour to several hours.
```

1          THE COURT:  Did it occur to you that the judge might
2     find it presumptuous that you gave a proposed order that filled
3     in the blanks for how much attorneys' fees were being awarded?
4     Do you know you did that?
5          MR. EDELSTEIN:  I apologize if we did, Your Honor.
6          THE COURT:  Do you know that you did?
7          MR. EDELSTEIN:  I did look at the proposed order
8     before we submitted it.  I did not catch that, Your Honor, I
9     apologize.
10          THE COURT:  It makes it easy, just sign it.
11          MR. EDELSTEIN:  No.  We do appreciate the time and
12     effort you take in pursuing the interest of the class on the
13     issues, especially we recognize it's not a disputed issue.  But
14     again, we did spend significant time and effort and obtained a
15     significant award for each of the 632 class and collective
16     members, I think above and beyond what most other firms could
17     have obtained in this type of case.
18          And while our rates that are used for the lodestar
19     crosscheck may be higher than typical, I think we still have,
20     as you noted, a third of our lodestar is represented by the fee
21     request.  It's not a positive multiplier.  And even if our
22     rates were significantly lower, I think we'd still be in a
23     negative multiplier territory.
24          THE COURT:  Well, that I think is your best -- that
25     there's no multiplier.  I don't know why a possibly part-time

1    staff attorney in Texas is worth more than a shareholder at
2    Berger or the highest hourly rate, $644, a distinguished
3    Massachusetts firm, certainly experienced Massachusetts firm,
4    Lichten Liss-Riordan.  It's just fiction.
5           MR. EDELSTEIN:  And we understand that.  And I mean,
6    we don't -- as you noted, we don't charge clients, and we don't
7    have any other basis other than what's been approved by other
8    courts.
9           THE COURT:  There are firms that do class action
10   litigation that, you know, I'm told have an annual process
11   where they review what the rates are that are charged in
12   markets they work in.  I don't know if -- did anybody ask
13   Mr. Finberg what he charges?  It probably would help you.  You
14   can say we should get paid what our adversaries get paid per
15   hour.  This is information you should be trying to develop.
16   But in this case I find the lodestar check -- I can't do a
17   lodestar check.  You put that in as one of the findings, too.
18          All right.  Would anybody else like to be heard on
19   this?
20          All right.  Well, I do admire your energetic -- your
21   bringing your energy to these cases generally and your
22   experience, but I'm awarding you 30 percent of the common fund,
23   $555,000 plus the 41,000.
24          MR. EDELSTEIN:  I believe it was 44,000.
25          THE COURT:  $44,191.25.  As I say, I'm sitting here

1  serving as a fiduciary for the class.  As I understand it, that

2  30 percent was found to be the mean in that Eisenberg study in

3  2017, and the median is 33 percent, which means one half of the

4  award or lower, which is some indication of reasonableness but

5  not the most important.

6        I guess to me, having been immersed in these fee award

7  matters for the last too many years, I do in this case, like in

8  other cases, start with a presumption that 20 to 30 percent is

9  reasonable and that I should start at 25 percent and go up or

10 down.  And I could go up to 33 percent if I was persuaded it

11 was appropriate.  But I don't find that anything higher than 30

12 percent is most appropriate in this case.

13       The size of the fund is $1,800,000 roughly, and there

14 are more than 600 people benefitted.  And a case like this

15 exemplifies the reason to have class actions.  The plaintiffs

16 individually, not very many of them could or would pursue

17 claims, and it wouldn't be cost efficient for an able,

18 experienced lawyer to represent them one at a time, so they

19 would have no recourse to the courts as a practical matter.

20       And the lawyers have brought skill and experience to

21 the case.  It's hard for me to determine whether they've been

22 efficient.  They say they eliminated hours for redundancy.  I

23 raised the question of the rates attributed to the staff

24 attorneys.  It just raises questions in my mind about how

25 efficient anybody is being, how accurate anybody is being, how

1    thoughtful anybody is being.  But this was complex litigation.

2    It lasted several years.  It was risky.  Although experienced

3    counsel choose their cases carefully, and in my experience, if

4    a case survives a motion to dismiss or a motion to certify,

5    plaintiff will almost always prevail.  That's my personal

6    experience.  But it's in most cases when they're chosen

7    carefully the class benefits and the lawyers benefit.

8            I know the awards in similar cases tend to be about 33

9    percent, but I don't know to what extent other judges apply the

10   usual standards to FLSA cases.  And with regard to public

11   policy considerations, I think they've been expressed very well

12   by counsel that the FLSA and the counterparts in the state

13   reflect important public policies that low-paid workers who are

14   unlikely to be able to fend for themselves and keep thelmselves

15   from being underpaid particularly need class actions.  But

16   while you may be disappointed to get $61,000 less than you

17   asked for, the message, since I gave you 30 percent, should be

18   that I find that you did a good job and performed an important

19   public service.

20           All right.  So let's go to the service awards in this

21   case.  I do find it's appropriate to make service awards as is

22   permissible and become far more common recently.  The named

23   plaintiffs, as I said earlier, didn't pick the lawyers and

24   didn't supervise the litigation as would be expected if they

25   were institutional clients in a securities case, but that's

1    partially because of the nature of the class.  And I am struck

2    by something that was argued in February that Mr. Fauntleroy

3    said on page 70 of the transcript about the risks that the

4    named plaintiffs took to come forward in this case.

5         Mr. Fauntleroy said that another potential employer --

6    Mr. Fauntleroy said on page 70 of the February 3, 2021

7    transcript, "The one issue I want to bring up as far as what

8    you're talking about is that there's only three companies that

9    do subcontract cable.  And when I went over to the other

10   company, they would ask me, like, different questions about J&L

11   and how they paid their employees and about certain things.

12   And they used to make jokes about how we can't hire anyone that

13   worked at J&L because we may have a liability later on down the

14   line, as far as if we don't pay you correctly, you may try to

15   sue us."

16        So I believe that coming forward to be a named

17   plaintiff in this could give somebody a reputation of being a

18   troublemaker that could injure his ability to get another job,

19   and that contributes to my conclusion that I should make

20   service awards.  I wonder if they should all get the same

21   service award.  They worked in the case for the same periods of

22   time.  You want $10,000 for each of them, but why is $10,000

23   the right amount, and why should they each get that amount --

24        MR. EDELSTEIN:  Your Honor --

25        THE COURT:  -- rather than something higher or lower?

 1           MR. EDELSTEIN:  -- $10,000 is similar, is an amount
 2    that's been approved by other courts for similar work on
 3    similar cases, and that's how we reached that number.  It does
 4    reflect, as you noted, the potential injury to their name in
 5    pursuing additional work.  It's easy enough to Google someone's
 6    name and see that they participated in a lawsuit over wages.  I
 7    think we all hope that wouldn't impact a future employer's
 8    hiring decision, but it very well may.  That's a risk they took
 9    again for the purpose of benefitting the class members, which
10    they did an excellent job here.  They all spent significant
11    number of hours.
12           THE COURT:  Well, 30 to 40.
13           MR. EDELSTEIN:  Yes, 30 to 40 hours each.  And while
14    some joined later, they still underwent the same calls and
15    investigation and participated in making sure that we had the
16    right classes and the right claims and the right allegations in
17    the amended complaint, all subject to discovery, and so they
18    all played a similar role, although some of them, as you noted,
19    for a bit longer than others, but ultimately the amount of time
20    that each spent and the risks associated with it are all
21    equivalent here.
22           Also all have signed and agreed to a general release
23    of their claims so their release is broader than just the
24    claims that were alleged in the complaint.  They were releasing
25    all potential claims that they could bring against J&L.

1              THE COURT:  For example, what?

2              MR. EDELSTEIN:  I mean, any type of other

3      discrimination.  Anything except workers' comp has been

4      released.  I would also note that all four of them were at the

5      preliminary hearing.  All four of the plaintiffs are here

6      today.  They've all played the same role in pushing this case

7      forward on behalf of the class and collective, and that's why

8      we feel they should all be compensated the same.

9              THE COURT:  Okay.  I mean, the advent of service

10     awards, which in my experience is relatively recently, creates

11     some tension because in approving the settlement, I'd say

12     well -- you know, I look to see if the named plaintiffs are

13     treated better than the other class members.  And they're not

14     in terms of your allocation plan, but they knew you were going

15     to ask for service awards.  They didn't know what amount.

16             The fact that $10,000 is customarily given in other

17     cases is saying other judges customarily find your staff

18     attorneys have a reasonable rate of $680 an hour, more than the

19     partners in Massachusetts.  That doesn't carry much weight.

20     But I think I'll say as fiduciary -- and I have thought about

21     reducing or not awarding them all the same.  But having just

22     saved the class $661,000 for attorneys' fees, I feel more

23     comfortable awarding each of the four named plaintiffs,

24     Mr. McKee, Mr. Fauntleroy, Mr. Jean-Pierre, Mr. Metelus a

25     $10,000 service award.

1          All right.  I think the last question, and I asked you

2    this last time, is whether Greater Boston Legal Services is a

3    suitable cy pres recipient if there's $50,000 or less leftover

4    after the distribution.  And you've provided me detail this

5    time that it is an organization that not only does good work

6    for low-income people but does wage and hour work.  Is that

7    right?

8          MR. EDELSTEIN:  Correct, Your Honor.

9          THE COURT:  All right.  I'm satisfied they're a

10   suitable cy pres recipient under the applicable standards.

11         Are there any other matters for today before I amend

12   your proposed order with regard to attorneys' fees?  And I

13   believe I'll enter it otherwise.

14         MR. EDELSTEIN:  Not from plaintiffs, Your Honor.

15   Thank you.

16         MR. FINBERG:  Not for defendant, Your Honor.

17         THE COURT:  All right.  Court will be in recess.  I'll

18   see my staff in the breakout room and the court reporter,

19   please.

20         MS. SCHALMAN-BERGEN:  Your Honor, thank you so much

21   for your time and attention to this matter.  And thank you to

22   Mr. Bennett for working with us.  It's been a pleasure to work

23   with you adversarially but also to work to get this done.  We

24   really appreciate it.

25         THE COURT:  Okay.  Thank you very much. (Adjourned.)

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3            I, Kelly Mortellite, Registered Merit Reporter

 4   and Certified Realtime Reporter, in and for the United States

 5   District Court for the District of Massachusetts, do hereby

 6   certify that the foregoing transcript is a true and correct

 7   transcript of the stenographically reported proceedings held in

 8   the above-entitled matter to the best of my skill and ability.

 9                    Dated this 16th day of December, 2021.

10

11                    /s/ Kelly Mortellite

12                    _____

13                    Kelly Mortellite, RMR, CRR

14                    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```